# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

MEGAN ALRED, individually and
as personal representative of the
estate of WILLIAM ALRED, *et al*.,

     Plaintiffs,

v.

PREFERRED COMPOUNDING
CORP.; CHARLES MICHAEAL
BARKER; and FICITIOUS
DEFENDANTS 1-10,

     Defendants.

Case No. 1:19-CV-1563-CLM

## MEMORANDUM OPINION

For the reasons stated below, the court finds that Plaintiffs possessed a reasonable basis for including Defendant Charles Michael "Mike" Barker in their complaint, and that Barker's presence in this case divests this court of jurisdiction. Accordingly, the court grants Plaintiffs' motion to remand to state court (doc. 6).

### BACKGROUND

A group of nine Plaintiffs allege that a facility owned and operated by Defendant Preferred Compounding Corporation ("PCC"), and managed by Defendant Barker, contaminated their drinking and bathing water with chemicals and/or metals that caused the Plaintiffs or their family members to contract cancer.

1

## A. The ProBlend Facility

PCC produces custom rubber products. From 1987 to 2015, PCC and its predecessor ProBlend operated a rubber production facility in Fruithurst, Alabama (the "ProBlend facility"). Plaintiffs allege that the ProBlend facility also produced various chemical and metallic by-products, including arsenic, chromium, and bis(2-ethylhexyl)phthalate ("DEHP"), each of which has been deemed to cause leukemia in humans. The Plaintiffs' case centers on where the Defendants discharged these pollutants and what (if anything) the Defendants told governmental regulators and the public about them. The Court starts with the 'where'—*i.e.*, an artesian well near the ProBlend facility.

## B. The Artesian Well

Water has a natural tendency to rest levelly across surfaces and underground. This level is referred to as the water table. Sometimes, though, water gets trapped by impermeable materials and cannot reach the water table. When water is trapped like this underground by impermeable layers of rock, the layer of trapped water is called a confined aquifer. If a hole is drilled into a confined aquifer from a point below the water table, natural pressure will cause the water to rise through the hole to the surface, as it tries to reach the water table. This is known as an artesian well. The following graph demonstrates how an artesian well works:



United States Geological Survey, *Artesian Water and Artesian Wells*, https://www.usgs.gov/media/images/artesian-wells-can-bring-water-land-surface-naturally.[1]

There is an artesian well approximately 250 feet from the ProBlend facility, and a runoff ditch connects the facility to the well. This artesian well is located at a higher elevation than other wells in the Fruithurst area, meaning that it may serve as a recharging point for the confined aquifer that feeds other wells in the area.

## C. ADEM Permitting

Production facilities like ProBlend must obtain a permit from the Alabama Department of Environmental Management ("ADEM") to discharge pollutants. The ProBlend facility, however, operated without a permit from 1987 to 1994. ProBlend obtained a permit in 1994—which it renewed in 1997, 2002, and 2007—but those permits were limited to stormwater discharges (not wastewater discharges)

---

[1] This graphic is not contained in Plaintiffs' complaint. The Court includes it only to assist the reader's understanding of (a) how artesian wells work and (b) the Parties' dispute as to whether ProBlend's chemical by-products could have traveled from the Fruithurst artesian well to Plaintiffs' homes.

and did not disclose the nearby artesian well.

Defendant PCC acquired the ProBlend facility sometime between 2007 and 2012. In June 2012, ADEM sent PCC a notice that ProBlend's 2007 permit would expire in September 2012 and that PCC must apply for a new permit.

PCC submitted its application on December 4, 2012. The application was signed by Defendant Barker, who identified himself as the "Plant Manager" of the ProBlend facility. Like ProBlend's previous applications, the 2012 application did not disclose the nearby artesian well. Plaintiffs allege this failure to disclose means that PCC was not permitted to discharge wastewater containing the aforementioned chemicals and metals into the artesian well; yet, the ProBlend facility captured and stored wastewater in a storage tank that, the Plaintiffs allege, ultimately released the wastewater into the runoff ditch that ran to the artesian well.

The 2012 Permit required PCC to perform and submit, twice each year, a storm water discharge monitoring report ("DMR"). The 2012 Permit specifically required PCC to test for the presence of DEHP, one of the chemicals linked to leukemia. Plaintiffs allege, however, that PCC did not submit any DMRs for the ProBlend facility from 2012 to 2015, when PCC closed the ProBlend facility.

**D. The Plaintiffs**

Each Plaintiff claims that he or she drank and/or bathed in water from the "Fruithurst city well system," a term that may or may not include the artesian well

(*see infra* 21-29). Each Plaintiff was diagnosed with some form of cancer (primarily leukemia) before January 2018, when they were informed that soil and water tests of the area revealed levels of DEHP, Arsenic, and Chromium, among other chemicals and metals.

## E. The State Court Lawsuit

Plaintiffs filed the present lawsuit in the Circuit Court of Cleburne County, Alabama. Plaintiffs included five counts, each pleaded under Alabama state law. Relevant here, Count I alleges that Defendants PCC and Barker negligently and/or wantonly breached their duty to prevent the discharge of toxic chemicals and metals into the groundwater that Plaintiffs drank and/or bathed in and that Defendants' negligent and/or wanton conduct caused Plaintiffs' illnesses.

Plaintiffs attached to their complaint a first set of interrogatories and requests for production. Among other things, Plaintiffs asked Defendant Barker to describe his role in ensuring environmental compliance at ProBlend (doc. 1-1 at 35-36, Interrogatories 1, 3-4, 6-7) and to provide copies of any communications he had with ADEM or any other person or entity related to environmental concerns at ProBlend (doc. 1-1 at 40-41, requests for production 2, 5).

## F. The Removal and Subsequent Proceedings

Defendants removed Plaintiffs' case to this court (doc 1). *See* 28 U.S.C. § 1441. In their notice, Defendants argue that Defendant Barker "has been fraudulently

joined" because Plaintiffs "have failed to state a legally sufficient claim" against him (doc. 1 at 2). Once Barker is removed, Defendants argue, complete diversity exists between Plaintiffs, each of whom is an Alabama citizen, and Defendant PCC, a citizen of Ohio and Delaware.[2] Complete diversity would vest this court with subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

Plaintiffs filed a motion to remand (doc. 6). In it, Plaintiffs do not dispute that the court has diversity jurisdiction if the court determines that Defendant Barker was fraudulently joined. Plaintiffs instead argue that at least one Plaintiff, Luke Willingham, has at least one viable claim (Count I: negligence/wantonness) against Defendant Barker, and thus under Eleventh Circuit law, their entire case must be remanded back to state court. Accordingly, the court describes the law regarding fraudulent joinder, and then applies that law to each of Defendants' three arguments as they relate to Plaintiff Willingham's claim of negligence and/or wantonness.

## FRAUDULENT JOINDER

Applying the proper standard is particularly critical in fraudulent joinder cases due to the struggle between a plaintiff's right to choose his forum, a defendant's statutory right of removal, and the federalism concern that state (not federal) courts should decide issues of state law. Accordingly, the Court details the history and

---

[2] For removal purposes, the court disregards the citizenship of the 10 unnamed fictitious Defendants. *See* 28 U.S.C. § 1441(b)(1).

standards for judging fraudulent joinder.

## A. Supreme Court Standard: "Reasonable Basis"

District courts have subject-matter jurisdiction over cases between "citizens of different states," if the matter in controversy "exceeds the sum or value of $75,000." *See* 28 U.S.C. § 1332(a). The Supreme Court has interpreted the phrase "citizens of different states" to require that all defendants be citizens of a different State than all plaintiffs; meaning that if just one defendant is a citizen of the same State as any plaintiff, diversity-based jurisdiction is destroyed. *See Carden v. Arkoma Assoc.*, 494 U.S. 185, 187 (1990).

Naturally, the complete diversity requirement opens up the possibility that, to avoid federal jurisdiction, a plaintiff might add a defendant that shares state citizenship with at least one plaintiff, even though the plaintiff believes that he has no viable claim against that defendant.

To combat this tactic, the Supreme Court created the "fraudulent joinder" doctrine in a series of cases decided through the early 1900's. *See, e.g., Chesapeake & O.R. Co. v. Cockrell*, 232 U.S. 146 (1914) ("this right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy"), *citing Alabama Great So. R.R. Co. v. Thompson*, 200 U.S. 206, 218 (1906); *Louisville & N. R.R. Co. v. Wangelin*, 132 U.S. 599 (1890). In a nutshell, the doctrine states that federal courts must ignore fraudulently joined

defendants when determining whether diversity among the parties exists.

The Supreme Court's fraudulent joinder cases turned on the question of whether the plaintiff had a "reasonable basis" in fact and law for including the resident defendant. *See Chesapeake*, 232 U.S. at 153 ("while the plaintiff's statement was not conclusive upon the railway company, it did operate to lay upon the latter, as a condition to a removal, the duty of showing that the joinder of the engineer and fireman was merely a fraudulent device to prevent a removal. Of course, it was not such unless it was without any reasonable basis"); *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 185 (affirming the finding of fraudulent joinder due to the "apparent want of basis for the allegations of the petitioner as to [Defendant] Wettengel's relations to the plaintiff"); *Kansas City Suburban Belt Ry. Co. v. Herman*, 187 U.S. 63, 71 (1902) ("The trial court may have erred in its ruling, or there may have been evidence which, though insufficient to sustain a verdict, would have shown that plaintiff had reasonable ground for a bona fide belief in the liability of both defendants."). Importantly, this "reasonable basis" standard governed the Supreme Court's last case judging fraudulent joinder: "As the joinder was a sham and fraudulent—*that is, without any reasonable basis in fact and without any purpose to prosecute the cause in good faith against the coemployé*—the result must be the same whether the local law makes for or against a joint liability." *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 98-99 (1921) (emphasis added).

**B. Eleventh Circuit Standard: "No possibility of recovery"**

Ninety-nine years have passed since the Supreme Court last decided a fraudulent joinder case, and as you might expect, the circuits' standards for judging fraudulent joinder claims have diverged over the years. *See* E. Farish Percy, *Making a Federal Case of It: Removing Civil Cases to Federal Court Based on Fraudulent Joinder*, 91 Iowa L. Rev. 189, 216-20 (describing four versions of the fraudulent joinder test). Some circuits apply the same "reasonable basis for the claim" test that the Supreme Court articulated in the early 1900's. *See id.* at 216, n. 126 (citing cases from the Third, Sixth, Eighth, and Tenth Circuit Courts of Appeals).

Other circuits—including the Eleventh Circuit—have gone from judging whether the plaintiff had "reasonable basis" for including the resident defendant, to judging whether there is a "possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997). In other words, the Eleventh Circuit standard places federal courts in the state court's shoes instead of the plaintiff's shoes. In fact, the Eleventh Circuit has analogized a federal district court's role in determining whether fraudulent joinder exists as being "similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b)," *id.*, including consideration of evidentiary materials such as "affidavits and deposition transcripts submitted by the parties." *Id.*

That said, the Eleventh Circuit has cautioned that the jurisdictional inquiry "must not subsume substantive determination," *id.* and that "federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Id.* Furthermore, "the district court must evaluate all factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff." *Id.* "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Id.*

### C. The Common Defense Rule

The Eleventh Circuit has yet to weigh in on another relevant standard/factor: the "common defense" or "common defect" rule. *See Henderson v. Washington Nat. Ins. Co.*, 454 F.3d 1278 n.4 (11th Cir. 2006) (declining to address the issue because the Court was reversing on other grounds); *Shannon v. Albertelli Firm, P.C.*, 610 Fed. Appx. 866, 872 n.4 (11th Cir. 2015) (same).

In a nutshell, the "common defense" rule states that any argument/defense that would decide the case on behalf of all defendants—not just the defendant alleged to be fraudulently joined—cannot form the basis of a federal court's finding of fraudulent joinder and corresponding denial of a motion to remand. The Fifth Circuit has explained the rationale for the rule thusly:

> [W]hen, on a motion to remand, a showing that compels a holding that there is no reasonable basis for predicting that state law would allow the plaintiff to recover against the in-state defendant necessarily compels the same result for the nonresident defendant, there is no improper joinder; there is only a lawsuit lacking in merit. In such cases, it makes little sense to single out the in-state defendants as "sham" defendants and call their joinder improper.

*Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568, 574 (5th Cir. 2004). Put another way, the federal court's job is to look for fraudulent joinder; not decide issues that resolve the entire case. That's the job of the state court.

The circuits have split on whether the "common defense" rule applies. *See* Percy, *supra*, at 230-39 (discussing the split and arguments on each side). This court (the Northern District of Alabama) seems to have addressed the issue only in an unpublished opinion. *See Skelton v. Saia*, 2018 WL 1784381 (N.D. Ala. April 13, 2018). In *Skelton*, the court initially denied Plaintiff's motion to remand, but reversed itself on a motion to reconsider when the Plaintiff raised the common defense rule for the first time. *Id.* The court held that (a) the "common defense" argument could not be waived due to its jurisdictional nature, (b) the court would apply the rule, despite the Eleventh Circuit having yet to do so, and (c) the defense at issue (*i.e.* Alabama's survival statute) was common to all Defendants and thus could not support a finding of fraudulent joinder. *Id.* at 1-4. Accordingly, the court reversed its earlier decision and remanded the case.

Of course, this court is not bound by its own unpublished opinion. That said, for consistency's sake, the court will apply the common defense rule to the two arguments raised by Defendants that apply equally to PCC and Barker—*i.e.* violation of Alabama's two-year statute of limitations (Argument #1) and the factual impossibility that Plaintiff Willingham drank or bathed in water from the artesian well (Argument #3).

* * *

In summary, Eleventh Circuit precedent requires this court to determine whether there exists any "possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants," which, in this case, is Defendant Mike Barker. *Crowe*, 113 F.3d at 1538. While it is not required by the Eleventh Circuit, the court will also determine whether the common defense rule applies to any of Defendants' arguments.

## ANALYSIS

Plaintiffs argue that Luke Willingham's negligence/wantonness claim against Barker demonstrates that there is a "possibility that a state court would find that the complaint states a cause of action against [Barker]." *Crowe*, 113 F.3d at 1538.

Defendants have raised three arguments that, they contend, demonstrate that there is no possibility that a state court would find Willingham's negligence claim viable. *See* Doc. 1 (notice of removal), 13 (opposition to motion to remand). The

court addresses all three of these arguments, as applied to Willingham's negligence or wantonness claim, in the order Defendants raised them.

## I.    Two-Year Statute of Limitations.

In their notice of removal, Defendants argue that all negligence claims against them are barred by Alabama's two-year statute of limitations. Doc. 1 at 13 (citing Ala. Code § 6-2-38; *Griffin v. Unocal, Corp.*, 990 So.2d 291 (Ala. 2008).

In their motion to remand, Plaintiffs note that Alabama law tolls the two-year statute until a person reaches 19 years of age. Doc. 6 at 9 (*citing* Ala. Code § 6-2-8). Because Plaintiff Willingham was born in December 2012 (doc. 1-1 at 24), Plaintiffs argue that the two-year statute cannot apply to Willingham. *Id*. Defendants did not respond to Plaintiffs' argument in their opposition to the motion to remand (doc. 13).

Defendants' argument fails for three reasons. First, by failing to respond to Plaintiffs' argument that the statute was tolled, Defendants have waived whatever argument they might have had against Plaintiff Willingham.

Second, there is "a possibility that a state court would find" that Alabama's age exception applies to Plaintiff Willingham and thus his negligence claim is not time barred. *Crowe*, 113 F.3d at 1538. The court interprets Defendants' silence on the issue to be an acknowledgment that Plaintiffs are, in fact, correct.

Third, this argument is precluded by the common defense doctrine. A statute of limitations defense applies equally to PCC and Barker.   If this court held that

there is no possibility that Willingham's claim *vis-à-vis* Barker could survive, and thus denied remand, the court would necessarily then rule that the same defense barred Willingham's case against PCC on a Rule 12 motion. The result would be this federal court dismissing Plaintiffs' entire case on a matter of state law; a result that violates the Eleventh Circuit's admonition that the district court's jurisdictional inquiry "must not subsume substantive determination." *Crowe*, 113 F.3d at 1538.

## II.     Barker's Personal Participation in Negligent and/or Wanton Conduct.

Plaintiffs allege in their complaint that Barker was the "Plant Manager" of the ProBlend facility and that PCC told ADEM that Barker was "the official representative of the facility who had overall responsibility for the operations" (doc. 1-1 at 7). Under Alabama law, for a manager to be deemed personally liable for a corporation's negligent or wanton acts, Plaintiffs must prove that the manager personally contributed to, or participated in, the acts.    *See Ex parte McInnis*, 820 So. 2d 795, 798-99 (Ala. 2001) ("A corporate agent who personally  participates, albeit in his or her capacity as such agent, in a tort is personally liable for the tort."); *Ex parte Charles Bell Pontiac-Buick-Cadillac-GMC, Inc.*, 496 So. 2d 774, 775 (Ala. 1986) ("In Alabama, the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting in a corporate capacity.").

Defendants argue that there is no possibility that Plaintiffs can prove that Barker personally contributed to the alleged contamination at the ProBlend facility in Fruithurst because Barker did not manage the ProBlend facility; he instead managed its sister facility in Tallapoosa, Georgia (doc. 1 at 9-13; doc. 13 at 5-12). Defendants claim that a different man, David Brown, was in charge of day-to-day operations at ProBlend. Defendants must provide "clear and convincing evidence" that there is no possibility Plaintiff Willingham could establish a negligence or wantonness claim against Barker. *Henderson*, 454 F.3d at 1281.

1. <u>Defendants' Submissions</u>: To support this argument, Defendants submitted a sworn declaration from Barker in which he declares that he "never worked at PCC's Facility in Fruithurst, Alabama ('ProBlend');" he instead "served as the Plant Manager at PCC's Facility in Tallapoosa" (doc. 1-2 at 2). Barker declares that David Brown was the on-site "Operations Manager at ProBlend" (doc. 1-2 at 4) and that Brown "worked to ensure site safety and compliance with environmental regulations and permitting," including "any testing and sampling required by the Alabama Department of Environmental Management ('ADEM')" (doc. 1-2 at 4).

According to Barker, his only "involvement in the alleged environmental issues at ProBlend" was signing PCC's permit application in 2012 (doc. 1-2 at 5). Barker further declares that he was never "tasked with personally monitoring or personally supervising ProBlend's waste generation, waste disposal, surfacewater

run-off, wastewater discharge, stormwater discharge, or other environmental activities" (doc. 1-2 at 5).

Citing this declaration, Defendants argue that Plaintiffs cannot possibly prove that Barker contributed to the alleged contamination at ProBlend because "Barker was not personally involved in those activities, and his Declaration is the only evidence before the Court on that point" (doc. 13 at 9). The Court rejects this argument for two reasons.

2. Plaintiffs' Submissions: First, Barker's declaration is not the only evidence before the Court regarding Barker's role at ProBlend. Plaintiffs cite multiple documents that they claim demonstrate Barker's personal involvement at ProBlend. Plaintiffs first point to a November 2012 letter in which PCC's Vice President of Manufacturing, Andrew Chan, informed ADEM that "Mike Barker, Plant Manager, is the official representative of the facility and has overall responsibility for the operations" (doc. 6-1 at 2).[3]

Plaintiffs next point to PCC's application to renew the ProBlend permit (doc. 6-2 at 37-45). Consistent with VP Chan's letter, Barker signed the application as the "Plant Manager" of the ProBlend facility, which according to the application, he could only do by certifying that (a) the application and its attachments "were

---

[3] The letter identifies the facility as "Preferred Compounding Corp. Fruithurst, AL 36262 Location" (doc. 6-1 at 2).

prepared under [his] direction or supervision" and (b) Barker had "overall responsibility for the operation of the facility" (*id.*).

Plaintiffs then point to ADEM's response, which informs "MIKE BARKER PLANT MANAGER" that the permit application was granted and that "[y]ou are responsible for compliance with all provisions of the permit including but not limited to, the performance of any monitoring, the submittal of any reports, and the preparation and implementation of any plans required by the permit" (doc. 6-2 at 2).

Finally, Plaintiffs point to two letters that ADEM sent to "MIKE BARKER PLANT MANAGER" that informed Barker of ProBlend's failure to comply with reporting requirements (docs 6-3, 6-4).

3. <u>Posture of the Case</u>: Defendants' argument that "Barker was not personally involved in those activities, and his Declaration is the only evidence before the Court on that point" (doc. 13 at 9) is not only inaccurate, it's specious. There's a reason that Defendants possess the only *declaratory* evidence of Barker's role at this point: Defendants removed this case from the state court before they had to answer Plaintiffs' Interrogatories and Requests for Production, many of which go to the heart of Barker's role at ProBlend. For example, Plaintiffs asked Barker to provide:

- His job title(s), duties, and responsibilities at PCC (Interrogatory 1);

- What steps he took to see that ProBlend's discharges were compliant with applicable licenses, permits, and regulatory authority (Interrogatory 3);

- Any environmental audits he performed at ProBlend (Interrogatory 4);

- All environmental-related reports that PCC prepared while he oversaw operations at the ProBlend facility (Interrogatory 6); and,

- Any communications he had with other persons regarding environmental concerns at the ProBlend facility (Interrogatory 7).

Doc. 1-1 at 35-36.   Plaintiffs also asked Barker to provide copies of:

- Any communications he had with any regulatory agency related to the ProBlend facility (RFP 2); and,

- Any communications he had with any person or entity related to environmental concerns at the ProBlend facility (RFP 5).

Doc. 1-1 at 40-41.   And, should their case go forward, Plaintiffs will undoubtedly seek to depose Barker, David Brown, Andrew Chan, and others regarding the chain of command for environmental issues at the ProBlend facility.

Perhaps every bit of document production, written responses, and deposition testimony will corroborate Barker's declaration. Or, perhaps, an email or cross-examination response will suggest that Barker had a greater role than his declaration suggests. The court cannot know. All the court can say, at this point, is that it is unconvinced that Defendants clearly and convincingly hold the winning hand when Plaintiffs have yet to be dealt all of their cards.

4. <u>Possibility Standard</u>: The court finds that Defendants have failed to meet their "heavy burden" of providing clear and convincing evidence that Barker neither participated in, nor contributed to, the alleged negligent/wanton conduct at ProBlend. *Crowe*, 113 F.3d at 1538. Accordingly, the court finds that there is "a

possibility that a state court would find that the complaint states a cause of action" for negligence or wantonness against Barker. *Id*.

Again, the job of this court is "not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Id.* Ignoring the fact that Defendants have yet to be subjected to discovery, and limiting itself to just the documents submitted to date, the court finds that it is at least "arguable" that Barker was responsible for ensuring that pollutants from the ProBlend facility would not be released into surface or ground water. After all, Barker and PCC told ADEM that was Barker's role (not David Brown's), *see* docs. 1-2, 6-1, 6-2, 6-3, 6-4, and they never corrected ADEM's belief that, as "plant manager," Barker was responsible for ProBlend's environmental reporting requirements, despite an ADEM regulation that appears to require PCC to inform ADEM that "a different individual or position has responsibility for the overall operation of the facility." ADEM Administrative Code Rules 335-6-5.14(3). Furthermore, as Defendants concede (doc. 13 at 8), Barker had supervisory authority over ProBlend and David Brown (doc. 1-2 at 3-4), and there is at least "a possibility" that a state court (or jury) could find that Barker's declaration that his oversight was limited to economic, not environmental, issues was self-serving and designed to avoid liability.

This ruling is consistent with the district court's opinion in *Atwood v. Weyerhaeuser USA, Inc.*, 2010 WL 749337 (S.D. Ala. Feb. 26, 2010), a case that

similarly featured Defendants relying on plant managers' affidavits denying personal responsibility over environmental issues to defeat a motion to remand. In *Atwood*, the district court held that, while one of the plant manager's "patchy denials" of personal responsibility over environmental issues "may ultimately be victorious in denying liability, [] this court is unable to say at this stage that there is no possibility the plaintiffs have asserted a colorable claim of nuisance, negligence, wantonness and trespass against [the plant manager]. The decision as to the sufficiency of the pleadings and [the manager's] denials is for the state court, 'and for the federal court to interpose its judgment would fall short of the scrupulous respect for the institutional equilibrium between the federal and state judiciaries that our federal system demands.'" 2010 WL 749337 at *6 (quoting *Henderson*, 454 F.3d at 1284).

This court wholeheartedly agrees.

5. <u>Reasonable Basis (SCOTUS)</u>: Briefly, the court would reach the same conclusion if it applied the Supreme Court's standard of determining whether the Plaintiff possessed a "reasonable basis in fact" to include a negligence claim against Barker. *See Wilson*, 257 U.S. at 98-99. Regardless of whether the evidence ultimately shows that Mike Barker, David Brown, or some other person was responsible for environmental oversight at the ProBlend facility, the correspondence between ADEM, PCC, and Barker demonstrates that, when Plaintiffs filed their

complaint, they had a "reasonable basis" to allege that Barker was responsible for environmental oversight at ProBlend—thus making it impossible to say that Plaintiffs 'fraudulently' included Barker in their complaint.

## III.  The Link Between the Artesian Well and Plaintiffs' Homes.

Lastly, Defendants argue that there is no possibility that Plaintiffs can factually link the alleged contamination of the artesian well to the water used at Plaintiff's homes during Barker's tenure at ProBlend (2012 to 2015).   The court disagrees, but to explain why, the court must first provide some background regarding the facts and the pleadings; a background that reveals that the real dispute between the parties is how the Plaintiffs *alleged* they received water at their homes, not how they *actually* got their water.

1. <u>The Facts</u>: Everyone agrees that, starting in 1968, the Fruithurst municipal water system piped water from a storage tank, the artesian well, and another well to homes connected to the public system.   *See* Doc. 1-1 at 17-18 (complaint); Doc. 1-3 at 13 (notes from ADEM's April 2018 Pre-CERCLA Screening Assessment of the area around ProBlend). However, Defendants have offered a document that, they allege, definitively establishes that the municipal water system stopped using water from the artesian well in 1996 (doc. 1-3 at 13). Relevant to Plaintiff Willingham's claim, this document states that the Fruithurst municipal water system has received its water in from the Anniston municipal water system since 2011 (*id.*).

Defendants contend that this revelation is fatal to Willingham's claim because Willingham was born in 2012 (doc. 1-1 at 24), the same year that Baker assumed supervisory authority over ProBlend (doc. 1-2 at 3-4). Defendants argue that, if it is true that the Fruithurst municipal system has piped its water in from Anniston since 2011, then Barker's alleged negligence could not have caused Willingham's illness.

Defendants contend that their document creates a "dispositive question" of fact: "Were any of the Plaintiffs actually still connected to and receiving water from the two wells and storage tank between 2012 and 2015, when Barker was involved at ProBlend?" (Doc. 23 at 6-7.) Defendants wish to subpoena governmental authorities and depose certain Plaintiffs to answer that question (doc. 23 at 7-10).

But, thanks to oral argument and additional briefing on the issue, it is clear that this is not a *factual* dispute that must be resolved by documents and depositions; it's a *legal* dispute based on inartful pleading. In fact, the parties acknowledged the two most relevant facts during oral argument. Plaintiffs' counsel acknowledged that the Fruithurst municipal water system stopped distributing water from the artesian well long before 2012:

THE COURT:      So you don't dispute that in those particular time periods [1996 and 2011], that the City of Fruithurst or the Town of Fruithurst water system was changed?

MR. GRESHAM: It changed. Well, in terms of—if you are talking about municipal water, but all of these people [*i.e.* Plaintiffs] were on well water.  And they received all of their well water stemming from the aquifer and artesian well[.]

(Doc. 25 at 25). And, in discussing affidavits submitted by three Plaintiffs, Defendants' counsel acknowledged that Plaintiffs take water from their own wells:

> MR. SECCO:     So the real question is not whether they are getting water from their well. [The] real question is whether they have any personal knowledge about continuing to get water from the two wells near ProBlend. . . . They are not representing: We are getting water from our own well. That would be noncontroversial.

(Doc. 25 at 35). That Plaintiffs get water from their own wells is indeed "noncontroversial," *id.*, as demonstrated by the fact that at least two Plaintiffs (Alred and Griffith) have given television interviews that include video of their wells. *See* Brian Pia, *Well water dangers: Research shows 23% have contamination*, Aug. 6, 2019, http://www.abc3340.com/news/abc-3340-news-iteam/well-water-dangers; Brian Pia, *Growing number of Cleburne County cancer cases raising concerns*, Feb. 18, 2019, http://www.abc3340.com/news/abc-3340-news-iteam/growing-number-of-cleburne-county-ala-cancer-cases-raising-concerns.

If the parties agree on the facts, what then is the dispute? It is whether Plaintiffs *pleaded* that the contaminated water traveled from the artesian well to their homes either, (a) via underground aquifers that fed their private wells or (b) via the Fruithurst municipal water system. Option (a) is factually viable; option (b) is not.

2. The Pleadings: In their complaint, each of the nine Plaintiffs allege that, during the relevant time period, the "Fruithurst city well system" was their "primary water source" (doc. 1-1 at 23-26).     In an earlier section of the complaint, Plaintiffs

describe the "city well system" as follows:

B.    The Fruithurst Artesian Well and City Well System.

21.    The Fruithurst city well system was first opened in October of 1968 and consisted of two wells and one storage tank. One of these wells was an artesian well that still produces water today.

22.    The artesian well which provides water to the Fruithurst city well system is located approximately 250 feet from the Facility (the "Artesian Well"). The Facility has a runoff ditch which runs directly to the Artesian Well.

23.    The Artesian Well is located at a higher elevation than other wells in the area, making it a likely groundwater recharging site for the area.

(Doc. 1-1 17-18). The parties, as is apparent by now, interpret the term "Fruithurst city well system" differently.

Defendants read the term to refer to the Fruithurst municipal water system, which as previously mentioned, drew water from two wells and a storage tank from 1968 to 1996, from the county water authority from 1996 to 2011, and from the Anniston municipal water system from 2011 to present. *See* Doc. 1-3 at 13. Reading the complaint this way would break the causal link between Barker's alleged negligence, which must have occurred after 2011, and the Plaintiffs' water supply.

Plaintiffs maintained at oral argument that their complaint, read plainly, alleges that they drink well water that "is being recharged by the artesian well" (doc. 25 at 16). According to Plaintiffs, they continued to use well water after the

Fruithurst municipal water system switched to county water, then Anniston water, and Plaintiff Willingham used well water from his birth in 2012 until his diagnosis in 2016 (doc. 1-1 at 14-15). Reading the complaint this way would maintain the causal link between Barker's alleged negligence and Plaintiff Willingham's illness.

3. <u>Possibility of Recovery (CA11)</u>: Again, under Eleventh Circuit precedent, this court must determine whether there is "even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants." *Crowe*, 113 F.3d at 1538. If the answer to that question is 'yes, there is a possibility,' then the court must reject Defendants' fraudulent joinder argument and remand the case. The court finds two possible ways that Plaintiffs could survive a dispositive motion filed in state court, which individually and collectively warrant remand.

First, multiple statements in Plaintiffs' complaint make it possible that a state court could read Plaintiffs' complaint as Plaintiffs argue they wrote it—*i.e.* to allege that water contaminated at the ProBlend facility drained into the artesian well, which served as the recharging point for the underground aquifer that fed the Plaintiffs' private wells. Two such statements stand out.

The first, and most compelling, is the allegation in Paragraph 23 that "the Artesian Well is located at a higher elevation than other wells in the area, making it a likely groundwater recharging site for the area" (doc. 1-1 at 18). If Plaintiffs took

their water from a municipal water system, rather than their own private wells, then why would the existence of "other wells in the area," or the elevation of those wells, matter? Why would it matter that the artesian well was "the recharging site" for the "other wells" in the area? Paragraph 23, which is in the "facts" section that describes the term "Fruithurst city well system," only makes sense if it was included to support the theory that the artesian well served as the recharging point for the aquifer that provided water for the Plaintiffs' wells.

A second supporting statement is found in paragraphs 52 and 53:

52. Soil and water tests conducted through the area serviced by the Fruithurst city well system revealed levels of DEHP, Arsenic, and Chromium, among other compounds and metals, which well exceed the EPA's respective acceptable limits.

53. Upon information and belief, there are no other sources for DEHP, Arsenic and Chromium in the area at the levels found in the soil and water tests, other than PCC's operations at the Facility.

(doc. 1-1 at 22-23). If Plaintiffs alleged that they received their water from the municipal water system, rather than from the ground via private wells, then why would it matter that both "*soil* and water" was tested throughout the area? Soil tests from sites other than the ProBlend facility/artesian well are relevant only if Plaintiffs are taking their water from the ground, not pipes.

This is not to say that Defendants cannot cite portions of the complaint that support their reading of the term "Fruithurst city well system." They can. But it is

not this court's job to decide which party has the better reading. This court's role is limited to determining whether there is "even a possibility" that a state court would permit Plaintiffs' case to move forward. *Crowe*, 113 F.3d at 1538.

Under Alabama law, when faced with a motion to dismiss for failure to state a claim, "a complaint must be construed in favor of the pleader and should not be dismissed unless it appears beyond all doubt that the plaintiff can prove no facts in support of the claim which would entitle him to relief under some legally cognizable theory." *Jennings v. City of Huntsville*, 677 So. 2d 228, 229-30 (Ala. 1996) (quoting *Fontenot v. Bramlett*, 470 So. 2d 669, 671 (Ala. 1985)). Because Alabama law requires state judges to construe complaints in favor of Plaintiffs, and multiple allegations in the complaint support Plaintiffs' construction of the complaint, this court finds that there is at least a possibility that a state court would read Plaintiffs' complaint in a manner consistent with Plaintiffs' theory and thus deny a dispositive motion filed by Defendants on this issue.

There is a second possible outcome that favors Plaintiffs; the more likely one. Assume that instead of removing the case to federal court, Defendants had filed a Rule 12(b) motion to dismiss based on the same theory, and supported the motion with affidavits showing that the Fruithurst municipal water system no longer drew water from the artesian well. Rather than fight this interpretive battle, Plaintiffs almost certainly would have filed an amended complaint that clarified what they

meant by the term "Fruithurst city well system." Because this case has not been set for trial, the state court would "freely allow" the amendment, *see* Ala. R. Civ. P. 15(a), and Defendants' dispositive motion attacking the inartfully pleaded complaint would be rendered moot. In this scenario, Plaintiff Willingham's negligence/ wantonness claim would certainly move forward.

In sum, Plaintiffs prevail under the Eleventh Circuit's "possibility" standard for either of two reasons: (1) It is possible that a state court would deny Defendants' dispositive motion by reading Plaintiffs' complaint in the manner Plaintiffs' intended and/or (2) it is possible that Plaintiffs could avoid a dispositive motion by amending their complaint to eliminate any confusion. *See Crowe*, 113 F.3d at 1538.

4. Reasonable Basis (SCOTUS): Briefly, the court would reach the same conclusion if it applied the Supreme Court's standard of determining whether Plaintiff Willingham possessed a "reasonable basis in fact" to include a negligence claim against Barker. *See Wilson*, 257 U.S. at 98-99. Plaintiffs had reason to believe that PCC contaminated water that recharged their wells (doc. 1-1, ¶¶ 47-53), and as previously discussed, Plaintiffs had reason to believe that Barker was in charge of ensuring environmental compliance at PCC (doc. 1-1, ¶¶ 47-53). Whether Plaintiffs inartfully pleaded the causal link between PCC and Barker's (in)actions would play no role in determining whether Plaintiff Willingham fraudulently added Barker as a defendant.

5. <u>Common Defense</u>:    Finally, the court finds that Defendants' argument, as it pertains to Plaintiff Willingham, is precluded by the common defense theory. Again, Defendants argue that Plaintiff Willingham could not have been harmed by contamination at the ProBlend facility because the town of Fruithurst has provided water from Anniston (not the artesian well) since before Willingham's birth.    This defense applies equally to Barker and PCC.

If this court held that there was no possibility that Willingham's claim *vis-à-vis* Barker could survive, and thus denied remand, the court would necessarily rule that the same defense barred Willingham's case against PCC.    That result would prove that Plaintiffs were guilty of inartful pleading; not fraudulently joining Barker to avoid federal court. Furthermore, accepting an argument that results in the dismissal of all Defendants would violate the Eleventh Circuit's admonition that the district court's jurisdictional inquiry "must not subsume substantive determination." *Crowe*, 113 F.3d at 1538.

* * *

This court's ruling is limited: Based largely on the correspondence between Barker, PCC, and ADEM, Plaintiffs possessed a non-fraudulent reason to include Barker as a defendant. This court passes no judgment on Plaintiffs' ability to prove Barker's negligence or wantonness, nor their ability to link Barker's actions or inactions to their injuries. Those issues must be decided in state court.

For the reasons stated above, this Court finds that Defendant's request for additional discovery (doc. 23) is due to be denied and Plaintiffs' motion to remand (doc. 6) is due to be granted. Defendant's motion to strike (doc. 18) is moot. The court notes that its decision regarding additional discovery and remand would be the same even if Plaintiffs' affidavits (docs. 17-1, 17-2, 17-3) were stricken. This matter will be remanded to the Circuit Court of Cleburne County, Alabama. A separate order consistent with this Opinion is issued herewith.

**Done** on January 28, 2020.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE